Richard M. Garbarini (RG 5496)
GARBARINI FITZGERALD P.C.
250 Park Ave, 7th Floor
New York, New York 10177
Phone: (212) 300-5358
Fax: (888) 265-7054

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

| | |
|---|---|
| POSEIDON WAVE MEDIA LLC, | Case No.: 26-cv-6737 |
| Plaintiff, | **ECF CASE** |
| v. | **COMPLAINT AND JURY DEMAND FOR DAMAGES FOR COPYRIGHT INFRINGEMENT** |
| BLACK FORST LABS INC., | |
| Defendant. | |

-------------------------------------------------------------x

. Plaintiff POSEIDON WAVE MEDIA LLC, by and through the undersigned counsel, brings this Complaint and Jury Demand against defendant BLACK FORST LABS INC. ("BFL") for damages based on violations of the: (i) Copyright Act and Copyright Revisions Act, 17 U.S.C. §§ 101, et seq., (ii) the Uniform Trade Secret Act, N.Y. CLS Labor Law § 201-e, (iii) the Defend Trade Secrets Act, 18 U.S. Code § 183 et seq., and (iv) the Digital Millennium Copyright Act, 17 U.S.C. §§ 1201 *et seq*.

Plaintiff alleges below, upon personal knowledge as to itself, and upon information and belief as to other matters so indicated.

## SUBJECY MATTER JURISDICTION

1. This is a civil action seeking damages and injunctive relief for infringement under the Copyright Act, 17 U.S.C. §§ 101, et seq., the Defend Trade Secrets Act, 18 U.S. Code § 183 et seq., and (iv) the Digital Millennium Copyright Act, 17 U.S.C. §§ 1201 et seq. As such, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a), based on federal question jurisdiction.

## SPECIFIC JURISDICTION

2. Plaintiff owns and exercises exclusive control over two hundred and thirty-six (236) sound recordings and compositions (the "Copyrighted Tracks"), which are covered by one hundred and sixty-four (164) U.S. Copyright Registrations (the "Copyrighted Tracks").

3. Defendant is a corporation formed under the laws of Delaware with a headquarters in California.

4. Defendant, without a license or authority, reproduced, reverse-engineered, distributed, and publicly displayed plaintiff's Copyrighted Tracks as described in detail below.

5. Defendant unlicensed reproduction, public display, and distribution of the Copyrighted Tracks, among many other things, are torts committed outside the state.

6. At no time did have the right or authority to use the Copyrighted Tracks in any manner.

7. In fact, had defendant sought a license for the Copyrighted Tracks from plaintiff, prior to its acts of infringement, violations of plaintiff's trade-secret rights, and DMCA violations; it would not have received one.

8. Defendant derives significantly all of its revenue from interstate and international commerce.

9. Defendant is the United States arm of its German parent-company. Defendant has a national and international presence, with a significant presence in New York.

10. Defendant maintains a significant presence in New York. Defendant’s key investors like institutional backer Andreessen Horowitz is headquartered in New York City and led the company's seed round of funding from New York.

11. Defendant contracted with various New York entities to prepare and sell its pre-IPO shares.

12. Defendant has engaged with New York's design and tech community, including participation tied to events like NYCxDESIGN.

13. Defendant has partnered with prominent New York figures, in New York, like Martin Scorsese.

14. Defendant maintains deep ties and partner/investor presence in New York.

15. Plaintiff suffered a particularized injury, as described in detail below, in this Judicial District from the intentional torts of defendant in this Judicial District as described below.

16. The Copyrighted Tracks were, and are, commercially exploited by defendant.

17. Jurisdiction is conferred to this Court over defendant pursuant to CPLR § 302(a)(3)(ii).

**VENUE**

18. At bar, a substantial part of the events or omissions giving rise to the claim occurred in this Judicial District and venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b)(1)-(3).

## DUE PROCESS

19. There are no due process concerns in light of the fact that defendant committed systemic intentional tort at scale, knowing its action would inevitably have an impact in this Judicial District.

## THE PARTIES

20. Plaintiff POSEIDON WAVE MEDIA LLC ("POSEIDON") is a limited liability company existing and organized under the laws of the State of Wyoming with a headquarters located at 75-10 197th St, 1st Floor, Flushing, NY 11366.

21. Upon information and belief, defendant BLACK FOREST LABS INC. ("BFL") is a corporation formed under the laws of Delaware with a principal place of business located at 2261 Market Street, STE 22997, San Francisco, CA 94114. Defendant BFL may be served through its registered agent The Corporation Service Co., 1209 Orange St, Wilmington, DE 19801.

## FACTUAL BACKGROUND

22. Plaintiff owns and exercises exclusive control, by assignment, over two hundred and thirty-six (236) sound recordings and compositions (the "Copyrighted Tracks"), which are covered by one hundred and sixty-four (164) U.S. Copyright Registrations. See **Exhibit 1**.

23. The members of plaintiff have assigned all of their rights to the Copyrighted Tracks, as well as the rights to the trade secret methods and process employed to create the Copyrighted Tracks, to plaintiff. See **Exhibit 2**.

24. The two, and only, members of plaintiff are John Emanuele ("Emanuele") and Richard Cupolo ("Cupolo"), who are highly skilled musicians, each playing numerous musical instruments. Messrs. Emanuele and Cupolo met in high school and formed the band "The

American Dollar" in 2005 while they were in college. For more than two decades, Emanuele and Cupolo have developed their own unique approach to cinematic and ambient instrumental music. Through decades of constant experimentation and refinement, Cupolo and Emanuele have developed confidential and proprietary methods and processes of creating, and weaving together, numerous independent layers of music consisting of various instruments and sounds into a rich texture that is readily identifiable as "The American Dollar sound".

25. It takes anywhere from weeks, to several months, for Emanuele and Cupolo to develop a single song; endlessly refining the musical layers of each musical composition and recording. In more than two decades of constant work, Emanuele and Cupolo have composed two hundred and thirty-six (236) songs which are the Copyrighted Tracks at issue here.

26. The Copyrighted Tracks at issue here consist solely of: (i) cinematic or post-rock tracks, and (ii) ambient tracks, each group is purely instrumental. The ambient Copyrighted Tracks are comprised of textured layers of more ethereal sounds. The cinematic or post-rock Copyrighted Tracks have a richer texture of layered sound with at times driving percussion and guitar creating a more orchestral feel.

27. As purely instrumental recordings, the Copyrighted Tracks are ideal for licensing. In fact, for almost twenty (20) years, licensing has been the largest single source of plaintiff's revenue. It also makes the Copyrighted Tracks ideal for ingestion into, and duplication by, defendant's FLUX platform because there are no identifiable lyrics or singer on any of the Copyrighted Tracks.

28. Plaintiff's Copyrighted Tracks are in the top 1% of every major streaming service, like Spotify, and they have been licensed by scores of the largest companies and organization in the world. For example, plaintiff's Copyrighted Tracks have been licensed by: (i) Warner

Brothers for a major motion picture, (ii) Activision for its Spiderman II video game, and national advertising campaigns for companies like (iii) Yeti Coolers, (iv) DC Shoes, (v) Colgate, (vi) Apple, (vii) PBS, (viii) MLB Network, (ix) SONY, (x) the American Heart Association, as well as scores of other major organizations and brands.

29. Plaintiff's Copyrighted Tracks have also been licensed for use in scores of television programs including, but not limited to: (i) Keeping Up with Kardasians (E Network), (ii) CSI Miami (CBS Television), (iii) 16 and Pregnant (MTV), (iv) The Real World (MTV), (v) NIKE Battlegrounds (MTV), (vi) Alaska the Last Frontier (Discovery), (vii) Bad Girls Club (Oxygen), (viii) 30 for 30 (ESPN), (ix) Human Planet (discovery, (x) The Vineyard (ABC Family), and (xi) World of Adventure Sports (NBC).

30. The licenses issued by plaintiff to major companies for use in national advertising campaigns, video games, movies, television, etc., also play a pivotal role in marketing the Copyright Tracks and increasing revenue from streaming sources.

31. The licensing revenue generated from the Copyrighted Tracks has been reduced by nearly 80% since defendant launched its FLUX service. In fact, there is a clear line of demarcation in revenue fall-off dated from the public launch of defendant's FLUX service.

**DEFENDANT BFL**

32. Defendant is the Unites States arm of Black Forest Labs GMBH located in Freiburg, Germany.

33. Defendant BFL is a German-American artificial intelligence research company known for building state-of-the-art generative AI models for visual intelligence, including images, video, audio, and robotics action-prediction.

34. Defendant developed and implemented a generative AI search referred to as "FLUX" that offers video generation models with associated audio-files that is offered to creators, developers, and enterprises via on-premise deployments, and custom licensing.

35. Defendant BFL officially launched and released the FLUX.1 suite of text-to-image models on August 1, 2024 alongside the company's public debut.

36. FLUX1.1 Pro. released on October 2, 2024 and FLUX.1 Kontext released on May 29, 2025. Defendant released two updated versions of its FLUX platform after launch; (i) FLUX.2 which was released on November 25, 2025 (with the FLUX.2 (4B and 9B variants): released on January 15, 2026), and (ii) the core FLUX.3 multimodal foundation model was released in early access on July 23, 2026 (with its specialized FLUX.3 Image extension following on October 1, 2026).

37. The FLUX.3 (Multimodal Foundation Model) combines image, video, audio, and robotic action prediction in a single architecture. Defendant's FLUX.3 product allows users to enter text prompts to generate video images with digital music files. Users can prompt FLUX's service with a description of the music they want to generate, which can include specifying the song and band, and FLUX.3 generated a video with a sound-alike of the targeted song performed by the band included in the query.

38. The FLUX service offers custom licenses, as well as multiple "pay-as-you-go" services. With this model, defendant generates revenue by encouraging users to generate videos with associated digital music files and exploit them commercially. Put simply, the more digital video/music files FLUX its users create, the more the FLUX platform charges.

**DEFENDANT'S LACK OF TRANSPARENCY**

39. From the date of its public debut, defendant's FLUX platform has been highly controversial. Defendant BFL released its FLUX.1 system in August 2024 and provided no

transparency into training data making it impossible to determine whether specific copyright protected content has been used to train the FLUX.1 model.

40. Under the BFL Terms of Service, the company claims a broad, perpetual license to use user inputs and generated outputs to train its models. Critics and privacy advocates point out that this policy creates tension with strict data protection frameworks—particularly regarding user consent revocation and the right to be forgotten for identifiable human faces.

41. To address mounting pressure and the enforcement of the EU AI Act, defendant purportedly launched an official "Transparency Hub" to host disclosures under California Civil Code Section 3111 (AB 2013) and model documentation for general-purpose AI models.

42. Defendant's Transparency Hub, located at <https://bfl.ai/transparency> (depicted in the screen-shot below), claims:

> Black Forest Labs publishes this page to provide regulatory information about how our models are developed, trained, and governed. It hosts our training data disclosure under California Civil Code Section 3111 (AB 2013), model documentation and training data summaries for our General-Purpose AI models pursuant to the EU AI Act. These disclosures are published and updated, in accordance with applicable law, as our models are released or substantially modified. For more on our approach to safety and responsible development, see our Responsible AI Development Policy.

43. Below is a true and accurate screen-shot of defendant's purported Transparency Hub located at <https://bfl.ai/transparency>.



44. Despite multiple requests, however, to defendant by plaintiff, and plaintiff's counsel, to produce its model documentation prepared pursuant to the EU AI Act for Black Forest Labs' General-Purpose AI models, defendant has yet to produce the very documentation it has claimed it would "produce upon request."

45. In fact, in the weeks following each request to defendant to defendant to produce its model documentation (as defendant represented it would produce "on demand), defendant has refused to even respond.

46. Defendant has attempted to insulate its data intake modes used to train its FLUX platform from disclosure, for the sole purpose of protecting itself from the systemic copyright infringement defendant has employed to train its generative AI system.

47. However, in order to produce the "sound-alike" music files that imitate the genuine sound recordings and compositions created by musicians, like plaintiff, defendant engaged in a systematic pattern of copyright infringement and trade-secret theft.

48. While plaintiff cannot identify the exact sources which defendant targeted to "stream rip" the massive number of songs used to train its generative AI platform; e.g. Spotify, YouTube, etc., plaintiff can unequivocally demonstrate that defendant has indeed "ripped" plaintiff's, and many other artists, copyrighted music, and "ingested" the unlawfully reproduced recordings and compositions into its FLUX system.

49. Once plaintiff's songs were ingested into the FLUX platform by defendant, the incredibly powerful FLUX algorithm "reverse-engineered" plaintiff's unlawfully obtained content, so it could be analyzed as part of the "training" necessary for the generative AI system to produce such convincing imitation sound files. At its core, defendant's FLUX platform is a reverse-engineering machine. It is fed with the stolen recordings created by artists, like plaintiff,

and reverse-engineered the architecture of the stolen recordings. Defendant's FLUX system then spits out videos with imitation audio-files predicated on the stolen content it has consumed.

50. This is not conjecture, as detailed below, plaintiff has proven defendant ingested and reverse-engineered its Copyrighted Tracks by extensive analysis of the audio-files produced by FLUX along with the video files it creates. Plaintiff generated a sample of thirty-four (34) FLUX video/audio files.

51. Each prompt of the FLUX system had the format "make a video with a song that sounds like the song <<Copyrighted Track>> by the band The American Dollar". Defendant's FLUX.3 platform then created a video with an associated audio-file in response to each paid query. Each audio-file was then extracted the FLUX.3 generated content and analyzed.

52. Remarkably, each of the thirty-four (34) queries of the FLUX.3 platform produced a video with an associated audio-file that was remarkably similar to the Copyrighted Track used in the query. As described in far-more detail below, defendant's FLUX.3 platform recognized the targeted Copyrighted Track in the prompt, as well as the band The American Dollar in order to produce the sound-alike output. This could only have happened in one circumstance - defendant ingested and reverse-engineered plaintiff's Copyrighted Tracks in order to train its generative AI platform.

53. This is direct evidence that defendant unlawfully reproduce plaintiff's Copyrighted Tracks, reverse-engineered them in order to train its FLUX platform, and then created associated audio-files that parallel nearly every musical structure and element present in the targeted Copyrighted Track.

54. Plaintiff's analysis went even further than just a review of its Copyrighted Tracks. When the same query was used on defendant's FLUX.3 platform prompting it to "create a video

with a song that sounds like <<song name>> by the [Beatles/Rolling Stones/Sinatra]", the output associated audio-file created by defendant's FLUX.3 platform closely parallelled the song and artist identified in each query. In fact, when a fourth query was done with gibberish in the song name and band name, e.g. "create a song that sounds like hvgygyyg by the band dhdhddh", the FLUX.3 video and associated audio-file created was a haphazard, demonstrating the FLUX.3 platform was confused.

55. This proves that defendant's FLUX platform recognized plaintiff's band name, and the Copyrighted Track used in each query (as well as the songs of the artists in each query); a circumstance that can only occur with the illegal ingestion and reverse-engineering of the Copyrighted Tracks.

56. The video/audio files produced by defendant's generative AI service have resulted in a market saturated with machine-generated content that has directly competed with, cheapened, and ultimately drowned out plaintiff's (and other artists) genuine sound recordings and compositions.

57. The two, and only, members of plaintiff are individual artists who have developed an identifiable sound consisting of complex layers of music woven together and refined. For two decades, the members of plaintiff, have created, modified, and refined its confidential and proprietary methods and processes to create a unique system of layering numerous independent layers of music, which are then woven together like pieces to a puzzle. Plaintiff also created confidential and proprietary methods and processes employed to acquired create unique sounds that cannot be reverse engineered by normal means.

58. By "reverse-engineering" plaintiff's copyrighted recordings and compositions, and training its FLUX system on the resulting data, defendant's FLUX platform is able to

reproduce every system of music architecture present in the original musician created works. Defendant has not merely impermissibly reproduced plaintiff's copyrighted sound recordings and ingested them into its FLUX platform, it has impermissibly co-opted the confidential methods and process employed by plaintiff to create the Copyrighted Tracks. Decades of experimentation, at an incredible expense of both time and finances, has been impermissibly ingested, analyzed, and employed by defendant. Defendant impermissibly obtained the very trade-secrets plaintiff has diligently protected from disclosure.

**DEFENDANT TRAINED ITS AI PLATFORM USING THE COPYRIGHTED TRACKS**

59. The FLUX platform was developed by defendant to have the flexibly to perform tasks that are typically expected to require human intelligence to achieve. "Generative AI" is a kind of AI aimed at producing content such as text, images, and music, or (in FLUX's case) all three. Generative AI models like FLUX, are based on machine learning models. These models do not employ preset rules for generating outputs, but rather break the content ingested down to its fundamental architecture, analyzing the mechanisms used in the creation of that content, and deducing patterns in that architecture to from a large corpus of training content.

60. FLUX, like other generative AI models, is a reverse-engineering machine. It does not merely mimic the content ingested, but devises the very framework on which that content was built.

61. Defendant's FLUX stores the architecture and the patterns derived as billions of numerical parameters. In aggregate, these parameters constitute the model. The training process adjusts the parameters so that the model produces content that is based on the content on which the model is trained.

62. Consistent with the basic facts of how generative AI works, the content FLUX used to "train" its AI model includes plaintiff's Copyrighted Tracks which were reproduced and reverse-engineered by defendant's FLUX platform, without license or permission from plaintiff.

63. Defendant, in fact, could not have built a model capable of producing audio so similar to the Copyrighted Tracks without the initial act of reproducing the Copyrighted Tracks.

64. Given that the foundation of its business has been to exploit copyrighted content like plaintiff's Copyrighted Tracks without permission, defendant has been deliberately evasive about what exactly it has copied.

65. In fact, defendant has gone to significant lengths to protect the methods used to obtain the content used to train its FLUX platform, and the sources of that content. Only through painstaking analysis was plaintiff able to prove, as described in detail below, that defendant did indeed impermissibly ingest plaintiff's Copyrighted Tracks, and reverse-engineered the Copyrighted Tracks to produce audio files that are clearly based on what the FLUX platform has learned from the forgoing.

**METHID OF CONENT INGESTION BY DEFENDANT'S FLUX PLATFORM**

66. Defendant trains its FLUX AI model to produce audio output associated with video content by generally taking the following steps:

a. FLUX reproduces massive numbers of sound recordings and associated metadata by unlawfully accessing and downloading them from digital sources like YouTube despite technologies designed to prevent such piracy.

b. The unlawfully obtained recordings and compositions are then ingested, reverse engineered, and analyzed as the substance to train the FLUX system.

c. Defendant's FLUX platform also retains reproductions of the unlawfully obtained recordings and compositions for future training purposes as the system's ability to reverse-engineer and analyze the songs gets better.

d. Defendant's FLUX platform also converts the unlawfully downloaded songs into other audio formats to aid in the ingestion, reverse engineering, and analysis of the unlawfully obtained recordings and compositions.

67. After undergoing this training process, the FLUX platform gains the capacity to generate audio output based on FLUX's model, which, as just described, is a product of the unlawfully obtained sound recordings on which it was trained. When a user prompts FLUX.3's service with a text input (e.g., "create a video with a song that sounds like [Copyrighted Track] by the band the American Dollar"), the service generates a video and audio output based on the relevant packets of information obtained from reverse-engineering the unlawfully ingested sound recordings.

68. That is why, when prompted to create a song like, for instance, one of the Copyrighted Tracks, the output from FLUX closely mimics the identified Copyrighted Track as it is the most relevant to the prompted request. The sound files FLUX spits out not only mimics, but substantially copies, the structure and musical elements of the Copyrighted Track identified in the query.

69. Certain features of the outputs from FLUX betray that it was trained on particular data—in this case, the Copyrighted Tracks.

70. The FLUX.3 platform generates audio outputs that bear more than just a strong resemblance to the Copyrighted Track in the query. The audio output replicates the fundamental architecture of the Copyrighted Track; an architecture the members of plaintiff have spent decades developing. This is a telltale sign that such Copyrighted Tracks were included in FLUX's training data. The FLUX.3 generated music files not only resemble the musical elements of the original compositions, they recreate their distinctive emotional character, including a nostalgic and wistful tone.

71. This emotional effect is not incidental; it arises from the use of the same underlying systems of timing, spacing, layering, production, and development that define plaintiff's original Copyrighted Tracks. As a result, the FLUX.3 outputs reproduce both the structural design and the resulting expressive impact of the original Copyrighted Track.

72. In technical terms, by generating outputs that mimic sound recordings in its training corpus, FLUX's model reflects the machine-learning phenomenon known as "overfitting." An AI model is "overfitted" when it is too closely adapted to the data on which it was trained, making it difficult for the model to generalize to new data sets. One symptom of overfitting is a model that replicates portions of its training data. To take a simplified example, if a user inputs the prompt "an ambient song" into an overfitted AI model, the model may output a file that closely resembles the musical elements of many ambient tracks on which it trained.

73. Perhaps a better example of overfitting are the queries used by plaintiff to analyze defendant's FLUX system. When prompted to "create video with a song like [Copyrighted Track] by the band The American Dollar", defendant's system narrowly focuses on the identified Copyrighted Track to such an extent that the output becomes a close mimic of the original Copyrighted Track.

74. As the examples discussed below reflect, FLUX's model obviously was trained on the Copyrighted Tracks. Not only did the FLUX.3 platform recognize the targeted Copyrighted Track and band name in the query, it generated music files, discussed in detail below, that mimics the systems of timing, spacing, layering, production, and development that define the original works. Elements that plaintiff has spent decades refining. As a result, the FLUX.3 outputs reproduce not just the structural design but the resulting expressive impact of the targeted Copyrighted Track.

75. This infringement cannot be cured by simply loosening the FLUX model's fit or by implementing technical guardrails that make it less likely that outputs will match excerpts of the Copyrighted Tracks.

76. It is already too late; defendant's FLUX platform cannot "unlearn" the material on which it was trained. While defendant has gone to great lengths to conceals the sources and methods used for its training data, that does not alter the fact that defendant infringed plaintiff's rights to the Copyrighted Tracks the moment it reproduced and ingested them to create its model.

77. Defendant impermissibly obtained the trade-secrets and methods plaintiff has spent decades protecting once it reversed-engineered and analyzed the Copyrighted Tracks after ingestion.

78. Defendant's FLUX platform generates recordings that not only sound similar on the surface, but more importantly, follow the same timing, layering, textures, and overall structure of the Copyrighted Tracks that were created by plaintiff's members and are associated with The American Dollar sound. Each of the forgoing elements are not just generic elements of the genre, but the very heart of the sound plaintiff developed over decades of practice and refinement. When those same elements show up together, expressed in the same manner, it is quite evident that plaintiff's Copyrighted Tracks were used as the basis for defendant's FLUX platform.

79. Defendant is not only benefiting from its impermissible reproduction and ingestion of the Copyrighted Tracks, but from its reverse-engineering of plaintiff's confidential and proprietary methods and processes employed in the creation of the Copyrighted Tracks. Defendant has misappropriated the decades of time, and significant expense, expended in

developing and refining those confidential methods and processes brought to bear when creating each of the Copyrighted Track.

**FLUX.3's OUTPUTS CONFIRM COPYING AND INGESTION OF PLAINTIFF'S COPYRIGHTED TRACKS**

80. The fact that defendant's FLUX.3 platform generates videos with associated digital music files that mimic readily identifiable features of the targeted Copyrighted Tracks, supports the only possible conclusion that the FLUX platform is using the Copyrighted Tracks in training its AI model. To be clear, plaintiff is not presently alleging that these outputs themselves infringe the Copyrighted Tracks unless discovery reveals that they directly or indirectly recapture portions of the Copyrighted Tracks. The FLUX.3 platform's outputs confirm, as an evidentiary matter, that defendant has unlawfully reproduced and reverse-engineered the Copyrighted Tracks, and utilized the resulting data to build its FLUX service.

81. Specifically, plaintiff discovered that using targeted prompts that include the name of one of the Copyrighted Tracks and plaintiff's band name, FLUX.3 generated music files with key musical elements that identical or highly similar to the Copyrighted Track used in the query. Moreover, the FLUX music files generated from each prompt manifested the same layering structure, and certain unique sounds that can only be explained by defendant's impermissible access and reverse-engineering of plaintiff's confidential methods and process.

82. Plaintiff's testing of the FLUX.3 system was designed to demonstrate that plaintiff's Copyrighted Tracks were included in FLUX's training data, since FLUX.3 has attempted to conceal the recordings on which it has trained. The results confirm that defendant has copied and trained its FLUX AI system on the Copyrighted Tracks, based on the high degree of similarities between the FLUX generated music files and the Copyrighted Tracks. A degree of

similarity that would be impossible if defendant was not training its FLUX system on the Copyrighted Tracks.

83. Defendant's system not only recognized each of the prompted Copyrighted Tracks, it recognized the plaintiff's band name, and generated audio-files in the genre of the targeted Copyrighted Track in each query that closely mimicked the mood, feel, and key architectural elements of the Copyrighted Track in the query.

84. To be more specific, the FLUX.3 generated audio-file closely resembled the targeting Copyrighted Track's genre, rhythmic structure and temporal architecture; melodic structure and phrasing systems; harmonic structure and tonic movement; percussion structure and groove design; instrumentation and arrangement development; textural design and spatial processing; and total system of expression.

85. In fact, when songs by other bands were used in the same query, the FLUX.3 generated videos with associated audio-files that closely resembled those targeted songs.

86. For example, when FLUX.3 was given the query "Make a video with a song that sounds like Let It Be by the band the Beatles" – the FLUX.3 platform generated a video with an associated audio-file that closely resembled the song "Let it Be" by the Beatles, matching the song in genre, tone, architectural design, etc. See attached **Exhibit 3.**

87. The same query was entered in the FLUX.3 platform for the song "My Way" by Frank Sinatra, and "Satisfaction" by The Rolling Stones, the same result was achieved each time; to wit, defendant's FLUX.3 platform generated a video with an audio-file that closely resembled each of the targeted songs by the targeted artists. See **Exhibit 3**.

88. In fact, when the same query was run substituting gibberish for the song and band name, the FLUX.3 generated output was similarly gibberish. See **Exhibit 3**.

89. The FLUX.3 platform recognized each targeted song name, each targeted band name, and in response to each query FLUX.3 generated a video with an audio-file that closely resembled the song and artist in the query.

90. The only possible conclusion that can be reaches is that defendant's FLUX platform ingested and reverse-engineered plaintiff's Copyrighted Tracks as well as those by the artists in the other queries.

## METHODOLOGY OF ANALYSIS

91. John Emanuele, one of plaintiff's two managing members, and co-author of each of Copyrighted Tracks, conducted thirty-four (34) queries on the FLUX.3 platform, thirty (30) of those queries targeted separate Copyrighted Tracks.

92. Each query followed the format "make a video with a song that sound like [targeted song] by the band [targeted band]". The FLUX.3 platform generated a video with an associated audio-file in response to each query. All thirty-four (34) audio-files generated in response to each query are attached hereto as **Exhibit 3**.

93. While thirty (30) of the thirty-four (34) queries targeted Copyrighted Tracks by plaintiff's band "The American Dollar"; as a control, plaintiff also conducted three (3) queries of the FLUX.3 platform targeting well-known songs by other artists like the Beatles, Rolling Stones, and Frank Sinatra. Plaintiff also conducted one query using gibberish for the song and band names used in the query.

### i. The Results

94. Each query of FLUX.3 yielded a video with an associated music file. The music files generated in each query were titled "BFL [Copyrighted Track name] make-a-song-that-sounds".

95. For example, the query “make a video with a song that sound like Age of Wonder by the band The American Dollar”, FLUX.3 generated a video with an associated audio-file titled “BFL Age of Wonder make-a-song-that-sounds”.

96. Below is a true and accurate screenshot of the query for the Copyrighted Track “Age of Wonder”.




97. As for another example, the query “make a video with a song that sounds like Time by the band the American Dollar”, FLUX.3 generated a video with an associated audio-file titled “BFL Time make-a-song-that-sounds”.




98. As for a final example, the query “make a song that sounds like Lights Dim by the band The American Dollar”, FLUX.3 generated a video with an associated audio file titled “BFL Lights Dim make-a-song-that-sounds”.



99. As is obvious from the below, the audio output format generated by the FLUX.3 platform was consistent. See below.




100. Plaintiff conducted an in-depth analysis of the music files generated by defendant's FLUX.3 platform.

101. The audio-files generated by defendant's FLUX.3 platform were substantially similar to each targeted Copyrighted Track as well as the targeted songs by other artists.

102. The FLUX.3 generated audio-files closely mimicked the fundamental architecture, form, mood, etc. of each targeted Copyrighted Track.

**ANALYSIS**

103. Defendant's FLUX.3 platform generated thirty-four (34) videos in response to the thirty-four (34) queries. Each video has an associated audio file which was extracted and analyzed.

104. Each of the significant composite characteristics of the thirty-four (34) audio-files associated was analyzed. In general, the composite characteristics that were analyzed were the: rhythmic structure and temporal architecture; melodic structure and phrasing systems; harmonic structure and tonic movement; percussion structure and groove design; instrumentation and

arrangement development; textural design and spatial processing; and, total system of expression.

105. Each of the thirty-four (34) audio files was found, after extensive analysis, to closely resemble the targeted song in each query in every, or close to every, category analyzed.

**Example 1 – Signaling Through The Flames**

106. As for a first example, the Copyrighted Track titled "Signaling Through The Flames" ("Copyrighted Track I") was extensively analyzed against the FLUX.3 generated audio file titled "BFL Signaling Through The Flames make.a.somg.that.sounds.mp4".

107. FLUX.3 was queried with the prompt: "make a video with a song that sounds like Signaling Through The Flames by the band The American Dollar".

108. FLUX.3 created a video with a corresponding audio-file titled "BFL Signaling Through The Flames make.a.somg.that.sounds.mp4".

**I. Harmonic Structure and Tonal Movement**

109. Both the FLUX.3 generated audio-file and Copyrighted Track I use the same minor-key tonal environment and create a similarly melancholic emotional character. This creates a substantial similarity in the tone and feel, and is supported by the similar broader construction.

110. In both the FLUX.3 generated audio-file and Copyrighted Track I, there is a minor-key harmony combined with sustained bass tones, reverberant drums, electric guitars, organ textures, and repeating melodic figures associated with instrumental rock.

111. Both the FLUX.3 generated audio-file and Copyrighted Track I share substantially similar harmonic structure and tonal movement.

## II. Rhythmic Structure and Melodic Framework

112. Both the FLUX.3 generated audio-file and Copyrighted Track I utilize the same rhythmic structure based in the use of 1/16-note lead-guitar melodies.

113. In both the FLUX.3 generated audio-file and Copyrighted Track I, the guitar is not limited to sustained chords or occasional accents. In fact, the guitar is utilized in both the FLUX.3 generated audio-file and Copyrighted Track I to supply a faster melodic layer built around repeated sixteenth-note movement, creating continuous forward motion over the slower harmonic foundation.

114. The rhythmic and melodic structures of both the FLUX.3 generated audio-file and Copyrighted Track I closely parallel each other.

## III. Bass Structure and Sustained Harmonic Foundation

115. Both the FLUX.3 generated audio-file and Copyrighted Track I use bass notes that remain uninterrupted across the duration of an entire measure. This creates a sustained low-frequency foundation beneath the more active guitar material. Instead of having the bass constantly articulate short rhythmic events, the bass in both the FLUX.3 generated audio-file and Copyrighted Track I functions as a long-duration harmonic anchor around a faster 1/16-note lead-guitar movement.

116. This nearly identical division of roles between the bass line and guitar in both the FLUX.3 generated audio-file and Copyrighted Track I is a defining feature in the similarities in the overall arrangement of both the FLUX.3 generated audio-file and Copyrighted Track I.

## IV. Accent-Chord Placement and Instrumental Substitution

117. Both the FLUX.3 generated audio-file and Copyrighted Track I use a recurring accent chord on the first beat of each measure.

118. The sole distinction between the FLUX.3 generated audio-file and Copyrighted Track I is that the accent is performed on piano in Copyrighted Track I, and the corresponding accent is performed on electric guitar in the FLUX.3 generated audio-file.

119. The structural role, however, remains the same. In both the FLUX.3 generated audio-file and Copyrighted Track I, the first beat of the measure receives a distinct harmonic accent that marks the beginning of the bar and reinforces the larger phrase structure.

120. The FLUX.3 generated audio-file changes the instrument but preserves the placement and musical purpose of the key elements.

### V. Instrumentation and Arrangement

121. Both the FLUX.3 generated audio-file and Copyrighted Track I share the same genre and principal instrumental organization, including: (i) reverberant drums, (ii) electric guitars, (iii) organ, and (iv) bass.

122. These instruments individually are common to instrumental rock (more specifically to the sub-genre "post-rock" which best fits Copyrighted Track I). The predominant similarity between the FLUX.3 generated audio-file and Copyrighted Track I is the nearly identical manner in which the instruments are combined with the other shared features identified above, including the minor tonality, sustained measure-length bass, sixteenth-note lead-guitar movement, and recurring downbeat chord accents.

123. The arrangement in both the FLUX.3 generated audio-file and Copyrighted Track I distributes similar functions among a substantially overlapping group of instruments.

### VI. Production, Reverb, and Timbal Character

124. Both the FLUX.3 generated audio-file and Copyrighted Track I use reverberant percussion within a spacious instrumental-rock production environment.

125. The FLUX.3 generated audio-file and Copyrighted Track I closely parallel each other in instrumental selection, reverberant drum treatment, and overall spatial presentation.

### VII. Genre, Mood, and Overall Aesthetic

126. Both the FLUX.3 generated audio-file and Copyrighted Track I create a melancholic instrumental-rock atmosphere through a coordinated combination of musical choices, including the same, or highly similar: (i) minor key, (ii) sustained bass, (iii) reverberant drums, (iv) electric guitar, (v) organ, (vi) rapid lead-guitar movement, and (vii) recurring first-beat harmonic accents.

127. The melancholic similarity between the FLUX.3 generated audio-file and Copyrighted Track I functions as a supporting observation tied to concrete musical features rather than as an isolated claim about subjective mood.

128. Likewise, the same instrumental-rock genre arises from the interaction of the same broad instrument family, rhythmic organization, sustained harmonic foundation, and guitar-centered melodic activity.

129. The FLUX.3 generated audio-file reaches a highly similar melancholic instrumental-rock aesthetic through a collection of musical features that correspond to those used in Copyrighted Track I.

### VIII. Total System of Expression

130. There is a substantial overlap in the total system of expression between the FLUX.3 generated audio-file and Copyrighted Track I including the same, or highly similar use of: (i) minor-key tonality, (ii) a melancholic instrumental-rock character, (iii) reverberant drums, (iv) electric guitars, organ, (v) bass, (vi) bass notes sustained across entire measures, (vii) 1/16-

note lead-guitar melodies, and (viii) recurring accent chords on the first beat of each measure, performed on piano in the original and electric guitar.

131. Each of these elements operate identically at several different levels simultaneously in both electric guitar, organ and bass. For example, in both the FLUX.3 generated audio-file and Copyrighted Track I, sustained bass establishes the harmonic foundation, sixteenth-note guitar creates rapid melodic motion, and the first beat of each measure receives a recurring chordal accent.

132. This similarity is more than just the presence of common instruments, but the selection, timing, coordination, and functional relationship of several musical layers.

## IX. Analysis

133. The FLUX.3 generated audio-file reproduces a coordinated collection of unique musical characteristics found in Copyrighted Track I, including the same, or highly similar: (i) melancholic instrumental-rock environment, (ii) reverberant drums, (iii) measure-length sustained bass notes, (iv) recurring sixteenth-note lead-guitar movement, and (v) accent chords positioned on the first beat of each measure.

134. The forgoing is highlighted by the same or highly similar use of electric guitar, organ and bass in both the FLUX.3 generated audio-file and Copyrighted Track I.

135. The FLUX.3 generated audio-file AI recording changes some surface details, but the underlying organization remains closely comparable. Taken together, the similarities reflect correspondence in the selection, coordination, rhythmic placement, and functional interaction of multiple expressive elements, rather than dependence on any single generic feature in isolation.

136. Defendant clearly did the forgoing to train its FLUX system in order to generate a music file that closely mimics plaintiff's Copyrighted Track I.

**Example II – Age of Wonder**

137. As for a second example, the second Copyrighted Track titled "Age of Wonder" ("Copyrighted Track II") was extensively analyzed against the FLUX.3 generated audio file titled "BFL Age of Wonder make.a.somg.that.sounds.mp4".

138. FLUX.3 was queried with the prompt: "make a song that sounds like 'Age of Wonder' by the band the American Dollar".

139. FLUX.3 created a video with a corresponding audio file titled "BFL Age of Wonder make.a.somg.that.sounds.mp4".

**I. Harmonic Structure and Tonal Character**

140. Both the Flux.3 generated audio file and Copyrighted Track II use a minor-key tonal environment that contributes to a similarly dark, foreboding emotional character. The harmony in both works functions as part of a broader atmospheric construction rather than as a bright or conventionally upbeat harmonic foundation.

141. The similarity is therefore not limited to the generic use of a minor key. In both the Flux.3 generated audio file and Copyrighted Track II, that minor tonality is coordinated with sustained low bass, reverberant instrumentation, and repeating rhythmic melodic figures to create the same general type of tense, atmospheric instrumental-rock environment.

142. The technical analysis also demonstrates that the Flux.3 generated audio file and Copyrighted Track II are not simply identical recordings or straightforward copies at the signal level. The Flux.3 generated audio file clearly replicates the same architecture and expression as Copyrighted Track II, while not being a direct note-for-note replica.

143. For example, the tempos of the Flux.3 generated audio file and Copyrighted Track II differ. The Copyrighted Track II employs approximately a 106.62 BPM, and the Flux.3 generated audio file employs an approximately 132.86 BPM. The relevant similarities between

both demonstrate the substantial similarity between the organization and expressive function of the musical elements rather than identical absolute tempo.

144. Overall, the FLUX.3 generated audio file reproduces Copyrighted Track II's minor-key, foreboding tonal framework and coordinates that tonality with several of the same surrounding musical characteristics.

**II. Rhythmic Structure and Melodic Framework**

145. Both the FLUX.3 generated audio and Copyrighted Track II make extensive use of 1/8 and 1/16-note melodic patterns as important sources of musical movement.

146. Copyrighted Track II employs accented 1/16-note figures are performed on synth keyboard, while electric piano also supplies 1/8-note melodic movement. The FLUX.3 generated audio file employs the same accented synth-keyboard patterns organized around 1/16 note movement and guitar patterns organized predominantly around eighth-note movement.

147. This creates correspondence across more than one instrumental layer. The shared subdivision is not confined to an isolated phrase; similar note movement is distributed across the keyboard and guitar components of the arrangements.

148. both the FLUX.3 generated audio and Copyrighted Track II employ eighth-note melodic movement as a recurring organizing feature, including corresponding 1/8 and 1/16-note activity in both synthesizer/keyboard and guitar layers.

**III. Bass Structure and Tonic Foundation**

149. A particularly important shared arrangement characteristic between the Flux.3 generated audio and Copyrighted Track II is the treatment of the sub-bass.

150. Both the FLUX.3 generated audio and Copyrighted Track use the same sub-bass notes that remain uninterrupted for the duration of an entire measure.

151. Rather than using the bass primarily for short rhythmic attacks, both the FLUX.3 generated audio and Copyrighted Track II establish a continuous low-frequency foundation beneath the more active melodic and rhythmic material.

152. This produces a layered relationship between the sustained measure-length bass; i.e., repeating 1/8 and 1/16-note melodic movement.

153. The sustained bass in both the FLUX.3 generated audio and Copyrighted Track II provides continuity and harmonic weight while the keyboard and guitar figures provide movement above it. This similarity therefore concerns not merely the presence of bass—which would be commonplace—but the duration and musical function assigned to that bass in relation to the other layers.

154. The FLUX.3 generated audio reproduces Copyrighted Track II's use of uninterrupted, measure-length sub-bass tones as a foundation beneath more active 1/8 and 1/16-note melodic material.

### IV. Instrumentation and Arrangement

155. The instrumental palettes of both the FLUX.3 generated audio and Copyrighted Track II substantially correspond. Both feature: (i) reverberant drums, (ii) reverberant electric guitar, (iii) sub bass, reverberant keyboards, and (v) layered instrumental-rock textures.

156. Each identifiable instrument in both the FLUX.3 generated audio and Copyrighted Track II are the same; including their combined selection and treatment.

157. Both the FLUX.3 generated audio and Copyrighted Track II place heavily spatialized guitar, keyboards, and drums around a sustained low-frequency bass foundation and repeating eighth-note melodic figures. This creates a similar division of musical roles; including, (i) the sub bass supplies sustained harmonic weight, (ii) keyboards and guitars provide melodic

movement, and (iii) reverberant drums establish the rhythmic dimension while remaining integrated into the atmospheric sound field.

158. The FLUX.3 generated audio-file reproduces Copyrighted Track II's core instrumental palette and the functional relationship among its reverberant drums, electric guitar, keyboards, and sustained sub bass.

**V. Production, Reverb, and Timbral Character**

159. The reverberation is a defining production characteristic of both the FLUX.3 generated audio and Copyrighted Track II. For example, rather than appearing on only one isolated instrument, spatial processing extends across multiple elements including, drums, electric guitar, and keyboards. Each instrument is presented with the same reverberant characteristics.

160. This is significant to the overall sonic construction because the reverb connects otherwise distinct instrumental layers into a unified atmospheric space. Combined with the same sustained sub bass and minor-key material, this contributes directly to a substantially similar dark, spacious quality, shared by both the FLUX.3 generated audio and Copyrighted Track II.

161. Both the FLUX.3 generated audio and Copyrighted Track II coordinate extensive reverberation across drums, electric guitar, and keyboards, creating a substantially similar spacious instrumental environment despite measurable differences in their overall spectral profiles.

**VI. Genre, Mood, and Overall Aesthetic**

162. Both the FLUX.3 generated audio and Copyrighted Track II present the same foreboding instrumental-rock character. That similarity emerges from the interaction of several musical choices rather than from mood in isolation.

163. Both the FLUX.3 generated audio and Copyrighted Track II share the same: (i) minor tonality, (ii) sustained sub bass, (iii) reverberant drums, (iv) reverberant electric guitar, (v) reverberant keyboards, and (vi) recurring eighth-note melodic movement.

164. The foreboding quality in both the FLUX.3 generated audio and Copyrighted Track II is consequently tied to a recognizable combination of arrangement, harmony, instrumentation, rhythm, and production choices.

165. Likewise, the instrumental-rock similarity between the FLUX.3 generated audio and Copyrighted Track II is not merely a genre label. Both the FLUX.3 generated audio and Copyrighted Track II realize that aesthetic through substantially corresponding instrumental roles and production treatments.

166. Overall, the FLUX.3 generated audio reaches the same foreboding instrumental-rock aesthetic as Copyrighted Track II through a coordinated collection of musical and production characteristics.

### VII. Total System of Expression

167. The total system of musical expression between the FLUX.3 generated audio and Copyrighted Track II is nearly identical.

168. Both the FLUX.3 generated audio and Copyrighted Track II encompasses multiple interacting musical dimensions; including, (i) the same foreboding emotional character, (ii) minor-key tonality (iii) instrumental-rock construction, (iv) reverberant drums, (v) reverberant electric guitar, (vi) sustained sub bass, (vii) reverberant keyboards, (viii) uninterrupted measure-length bass notes, and (ix) accented 1/8 and 1/16-note keyboard patterns and 1/8-note guitar melodic patterns.

169. Of particular importance is the manner in which the forgoing characteristics operate together in both the FLUX.3 generated audio and Copyrighted Track II.

170. Both the FLUX.3 generated audio and Copyrighted Track II place active 1/8 and 1/16-note guitar and keyboard movement above sustained measure-length sub bass, within a minor-key environment populated by reverberant drums, guitar, and keyboards.

171. The numerous substantial similarities therefore exist not only at the level of individual ingredients but in their selection, coordination, and functional interaction.

**VIII. Analysis**

172. The FLUX.3 generated audio reproduces the coordinated collection of musical characteristics found in Copyrighted Track II; namely, the same: (i) minor-key tonality, (ii) foreboding instrumental-rock atmosphere, (iii) reverberant drums, (iv) use and employment of the electric guitar and keyboards, (v) sustained measure-length sub-bass notes, and (vi) recurring 1/8 and 1/16-note melodic patterns distributed across synthesizer/keyboard and guitar layers.

173. The notable correspondence between the FLUX.3 generated audio and Copyrighted Track II is amplified by the facts that multiple expressive decisions are preserved simultaneously; e.g., (i) the tonal environment, (ii) instrumental palette, (iii) spatial treatment, (iv) bass behavior, (v) rhythmic subdivision, and (vi) allocation of melodic movement among instruments.

174. Taken together, the FLUX.3 generated audio reproduces Copyrighted Track II's system of musical expression in which sustained low-frequency foundations (1/8 and 1/16-note melodic motion, minor tonality, reverberant instrumental textures, and a foreboding instrumental-rock aesthetic) are coordinated in substantially the same overall musical conception.

## Example III – Anything You Synthesize

175. As for a third example the Copyrighted Track titled "Anything You Synthesize" ("Copyrighted Track III") was extensively analyzed against the FLUX.3 generated audio file titled "BFL Anything You Synthesize make.a.somg.that.sounds.mp4".

176. FLUX.3 was queried with the prompt "make a song that sounds like 'Anything You Synthesize' by the band the American dollar".

177. FLUX.3 created a video with a corresponding audio file titled "BFL Anything You Synthesize make.a.somg.that.sounds.mp4".

178. As detailed below, nearly every key element of the Flux.3 generated audio-file is substantially similar to Copyrighted Track III.

### I. Harmonic Structure and Tonal Character

179. Both the FLUX.3 generated audio-file and Copyrighted Track III use a major-key tonal environment that contributes to a similarly uplifting and comforting emotional character.

180. That similarity is reinforced by the surrounding arrangement. In both the FLUX.3 generated audio-file and Copyrighted Track III, the major-key setting is paired with reverberant drums, reverberant synth-keyboard lead lines, sustained sub bass, and repeating melodic subdivision patterns.

181. Both the FLUX.3 generated audio-file and Copyrighted Track III share very similar harmonic, rhythmic, and instrumental elements. Perhaps more importantly, the highly similar organization of those elements enables the FLUX.3 generated audio-file to share the same feeling and mood as Copyrighted Track III.

182. In conclusion, the FLUX.3 generated audio-file reproduces Copyrighted Track III's major-key, uplifting tonal environment within a closely corresponding instrumental-rock arrangement.

### II. Percussion Structure and Groove Design

183. Both the FLUX.3 generated audio-file and Copyrighted Track III use a drum pattern based on two bass-drum hits and two snare hits per measure. This is not a common feature in this genre of music.

184. Most of those principal drum events in both the FLUX.3 generated audio-file and Copyrighted Track III fall on 1/4-note positions. Copyrighted Track III contains one specific variation--the later bass-drum hit is displaced half a beat earlier onto the intervening 1/8-note position, while the remainder of the principal pattern stays anchored to the quarter-note framework.

185. One of the important corresponding elements shared by the FLUX.3 generated audio-file and Copyrighted Track III is the same two-kick/two-snare construction and overall quarter-note organization.

186. This is not a common feature in the genre, and the shared elements demonstrates defendant's FLUX.3 clearly trained on Copyrighted Track III.

### III. Melodic Construction and Phrasing Systems

187. Both the FLUX.3 generated audio-file and Copyrighted Track III use reverberant synth keyboards as primary melodic voices, and both contain lead-melody passages organized around 1/16-note movement. This creates a substantial similarity between the Flux.3 generated audio-file and Copyrighted Track III in both instrumental function and rhythmic subdivision. In each work, the synth keyboard is not merely an atmospheric pad; it supplies active melodic material through rapid, recurring note patterns.

188. The FLUX.3 generated audio-file BFL work reproduces Copyrighted Track III's use of reverberant synth keyboards as lead melodic instruments and its use of rapid sixteenth-note melodic movement.

**IV. Bass Structure and Harmonic Foundation**

189. Both the FLUX.3 generated audio-file and Copyrighted Track III use sub-bass notes sustained uninterrupted for the full duration of individual measures.

190. Rather than using the bass primarily as a series of short attacks, both the FLUX.3 generated audio-file and Copyrighted Track III allow the low note to continue beneath the changing melodic and percussion activity above it.

191. This creates the same fundamental division of musical roles, including: (i) sustained measure-length sub bass, (ii) quarter-note percussion framework, and (iii) rapid 1/16-note synth melody.

192. The sustained bass in both the FLUX.3 generated audio-file and Copyrighted Track III gives the arrangements harmonic continuity while the drums and keyboards provide movement at faster rhythmic levels.

193. In sum, the FLUX.3 generated audio-file reproduces Copyrighted Track III's use of measure-length sub-bass sustain as a stable harmonic foundation beneath faster rhythmic and melodic layers.

**V. Instrumentation and Arrangement**

194. The principal instrumental arrangement of both the FLUX.3 generated audio-file and Copyrighted Track III substantially overlap. Both feature the same or highly similar: (i) reverberant drums, (ii) reverberant synth keyboards functioning as lead melodies, and (iii) sustained sub bass.

195. These elements individually are not unusual, but specific similarity lies in the roles assigned to them and the way they operate together. For example, both the FLUX.3 generated audio-file and Copyrighted Track III contain: (i) sub bass provides long-duration harmonic support, (ii) drums supply a recurring kick/snare framework, and (iii) reverberant synth keyboards carry active rapid melodic material.

196. The arrangement of both the FLUX.3 generated audio-file and Copyrighted Track III divide harmonic, rhythmic, and melodic functions in highly similar ways.

197. It is clear, the FLUX.3 generated audio-file reproduces Copyrighted Track III's core instrumental palette and the functional relationship among sustained bass, electronic percussion, and reverberant synth lead lines.

### VI. Production, Reverb, and Timbral Character

198. Reverberation is an important production characteristic in both the FLUX.3 generated audio-file and Copyrighted Track III, particularly on the drum and synth-keyboard layers.

199. The similarity between the FLUX.3 generated audio-file and Copyrighted Track III in the use of reverberant drums, spacious keyboard treatment, and low-frequency bass foundation is profound. Each has a closely corresponding reverberant production approach across their principal rhythmic and melodic instruments.

200. It is readily apparent that both the FLUX.3 generated audio-file and Copyrighted Track III have the same, or highly similar, production, reverb, and timbral character.

### VII. Genre, Mood, and Overall Aesthetic

201. Both the FLUX.3 generated audio-file and Copyrighted Track III create an uplifting, comforting instrumental-rock atmosphere through the interaction of many shared musical characteristics. Both the FLUX.3 generated audio-file and Copyrighted Track III have the same, or

highly similar: (i) major key, (ii) reverberant drums, (iii) reverberant synth leads, (iii) sustained sub-bass, (iv) quarter-note percussion organization, and (v) 1/16-note melodic movement.

202. The genre, mood and overall aesthetic between both the FLUX.3 generated audio-file and Copyrighted Track III are tied to concrete musical choices rather than standing alone as a subjective mood comparison.

203. Similarly, the genre correspondence arises from the same combination of rhythm-section structure, sustained bass, active synth melody, spacious production, and absence of vocals.

204. The FLUX.3 generated audio-file reaches a highly similar uplifting instrumental-rock aesthetic through a coordinated set of musical and production features also present in the original.

205. It is readily apparent, both the FLUX.3 generated audio-file and Copyrighted Track III share the same, or highly similar, genre, mood and overall aesthetic.

**VIII. Total System of Expression**

206. There are substantial similarities between the FLUX.3 generated audio-file and Copyrighted Track III total system of expression, including, but not limited to the same, or highly similar: (i) major-key tonality, (ii) uplifting and comforting emotional character, (iii) instrumental-rock construction, (iv) reverberant drums, (iv) reverberant synth-keyboard lead melodies, (v) sustained sub bass, (vi) bass notes lasting through complete measures, (vii) two-bass-drum/two-snare percussion pattern, (viii) predominantly quarter-note placement of the principal drum strikes, (ix) specific eighth-note displacement in the original percussion pattern, and (x) 1/16-note synth-keyboard melodies.

207. The forgoing musical features interact across several musical levels in both the FLUX.3 generated audio-file and Copyrighted Track III. The sustained bass supplies harmonic

continuity, the percussion establishes the underlying pulse, and the rapid synth-keyboard melody provides forward melodic motion.

208. Both the FLUX.3 generated audio-file and Copyrighted Track III employ the same or highly similar selection, rhythmic placement, instrumental allocation, and interaction of multiple elements, rather than any single common musical device.

### IX. Analysis

209. The FLUX.3 generated audio-file had a substantially similar architecture and mood, and mimicked nearly every major element present in Copyrighted Track III.

210. Taken together, the similarities reflect correspondence in the selection, coordination, rhythmic hierarchy, instrumental roles, and production treatment of multiple expressive elements, rather than reliance on any one generic feature in isolation.

211. The forgoing can only be explained by defendant's ingestion and reverse-engineering of Copyrighted Track III by defendant's generative AI platform. This violates plaintiff's rights as set forth in 17 U.S.C. § 106, and represents a violation of plaintiff's trade-secret rights.

## OTHER EXAMPLES

212. Plaintiff performed queries on defendant's FLUX.3 platform for twenty-seven (27) additional Copyrighted Tracks. The identical prompt was used for each Copyrighted Track and the FLUX.3 music files created from each prompt yielding the same results; namely, music files that had the same genre, mood, and the same, or substantially similar, musical architecture and key musical features as the targeted Copyrighted Track.

213. Below is a chart of the additional Copyrighted Tracks analyzed, and the resulting musical files created by FLUX.

| Copyrighted Track Used in Query | FLUX.3 Audio File | Analysis |
|---|---|---|
| 4 BC | BFL 4 BC make.a.somg.that.sounds.mp4 | Highly similar key musical elements |
| Age of Wonder | BFL Age of Wonder make.a.somg.that.sounds.mp4 | Highly similar key musical elements |
| Anything You Synthesize | BFL Anything You Synthesize make.a.somg.that.sounds.mp4 | Highly similar key musical elements |
| As We Float | BFL As We Float make.a.somg.that.sounds.mp4 | Highly similar key musical elements |
| Atlantis | BFL Atlantis make.a.somg.that.sounds.mp4 | Highly similar key musical elements |
| Bump | BFL Bump make.a.somg.that.sounds.mp4 | Highly similar key musical elements |
| Carousel | BFL Carousel make.a.somg.that.sounds.mp4 | Highly similar key musical elements |
| Chill Kingdom | BFL 4 BC make.a.somg.that.sounds.mp4 | Highly similar key musical elements |
| Chillpoint Break | BFL Chill Kingdom make.a.somg.that.sounds.mp4 | Highly similar |
| DEA | BFL DEA make.a.somg.that.sounds.mp4 | Highly similar key musical elements |
| Everyone Gets Shot | BFL Everyone Gets Shot make.a.somg.that.sounds.mp4 | Highly similar key musical elements |
| Faces In The Haze | BFL Faces In The Haze make.a.somg.that.sounds.mp4 | Highly similar key musical elements |
| Fade In Out | BFL Fade In Out make.a.somg.that.sounds.mp4 | Highly similar key musical elements |
| Guided By The Glowing Sea | BFL Guided By The Glowing Sea make.a.somg.that.sounds.mp4 | Highly similar key musical elements |
| Lights Dim | BFL Lights Dim make.a.somg.that.sounds.mp4 | Highly similar key musical elements |

| | | |
|---|---|---|
| Moms | BFL Moms make.a.somg.that.sounds.mp4 | Highly similar key musical elements |
| Mosaic | BFL Mosaic make.a.somg.that.sounds.mp4 | Highly similar key musical elements |
| Par Avion | BFL Par Avion make.a.somg.that.sounds.mp4 | Highly similar key musical elements |
| Rudiments Of A Spiritual Life | BFL Rudiments Of A Spiritual Life make.a.somg.that.sounds.mp4 | Highly similar key musical elements |
| Shadows | BFL Signaling Through The Flames make.a.somg.that.sounds.mp4 | Highly similar key musical elements |
| Signaling Through The Flames | BFL 4 BC make.a.somg.that.sounds.mp4 | Highly similar key musical elements |
| Starscapes | BFL Starscapes make.a.somg.that.sounds.mp4 | Highly similar key musical elements |
| Steeltown (Ambient) | BFL Steeltown (Ambient) make.a.somg.that.sounds.mp4 | Highly similar key musical elements |
| The Slow Wait Part 1 | BFL The Slow Wait Part 1 make.a.somg.that.sounds.mp4 | Highly similar key musical elements |
| Thunder Rising | BFL Thunder Rising make.a.somg.that.sounds.mp4 | Highly similar key musical elements |
| Time | BFL Time make.a.somg.that.sounds.mp4 | Highly similar key musical elements |
| Up | BFL Up make.a.somg.that.sounds.mp4 | Highly similar key musical elements |
| Wake Up Summer | BFL Wake Up Summer make.a.somg.that.sounds.mp4 | Highly similar key musical elements |
| War On Christmas | BFL War On Christmas make.a.somg.that.sounds.mp4 | Highly similar key musical elements |
| We Hold On | BFL We Hold On make.a.somg.that.sounds.mp4 | Highly similar key musical elements |
| We're Hitting Everything | BFL We're Hitting Everything make.a.somg.that.sounds.mp4 | Highly similar key musical elements |
| Wudao | BFL Wudao make.a.somg.that.sounds.mp4 | Highly similar key musical elements |

214. While each of the thirty (30) prompts (in total) was for an individual, and unique, Copyrighted Track, every query contained the same identifier; to wit, "by the band the American Dollar."

215. As a control, plaintiff created four (4) additional videos with associated audio-files, with other song and band-names identified in the query. As described previously, the songs by the Beatles, Rolling Stones, and Sinatra (and one gibberish) yielded audio-files that closely mimicked the targeted song by the targeted performer. The one "gibberish" query yielded a confusing, almost non-sensical result.

216. It is clear defendant's FLUX.3 platform recognized each Copyrighted Track name, as well as the track names by other artists, as well as each band/performer name, pulling the data from the reverse-engineered Copyrighted Tracks (and other tracks). Further proof of defendant's blatant copying is the naming system used by FLUX.3 to identify the thirty (30) music files created.

217. The FLUX.3 platform clearly attempts to mimic the very artistic expression plaintiff has spent decades developing when it automatically generates each song title.

218. Each of the thirty (30) music files generated by the FLUX.3 platform in response to plaintiff's thirty (30) Copyrighted Track directed queries possess such a high degree of similarity with the corresponding Copyrighted Track, that it would be impossible for defendant's FLUX.3 platform to have generated each of the sound files without having first unlawfully reproduced and reversed-engineered the Copyrighted Tracks.

219. The pervasive replication of key elements in the Copyrighted Tracks by defendant's FLUX.3 platform can only be explained by defendant's ingestion of plaintiff's

Copyrighted Tracks without license or authority, and in violation of plaintiff's rights as set forth in 17 U.S.C. § 106 and elsewhere.

220. The audio-files generated by FLUX.3 go far beyond merely mimicking the targeting Copyrighted Tracks, they co-opt the very musical architecture, tone, feel, and design the members of plaintiff have spent decades developing. Moreover, the audio-files generated by FLUX.3 attempt to mimic the very mood, character, and feel closely associated with plaintiff's Copyrighted Tracks.

221. While any element present in the FLUX.3 generated recordings is not persuasive, the systemic presence of scores of elements and features in the same architectural design can only be explained by defendant's unlawful reproduction of the Copyrighted Tracks, and use of the Copyrighted Tracks to train its generative AI platform.

222. The choices made on how to layer the tracks, adjust the rhythm, what to exclude and include, etc., took plaintiff's members decades to refine. Those decades of work have now been co-opted by the defendant, and used to train defendant's FLUX.3 platform in violation of plaintiff's rights.

223. Moreover, defendant did not delete the unlawfully reproduced Copyright Tracks from its FLUX.3 platform after the purported training was complete. Instead, defendant retained - and continues to retain - copies of the Copyrighted Tracks, in one or more stored datasets. Upon information and belief, defendant's repository of sound recordings, which includes the Copyrighted Tracks, functions as a permanent database or central library of copyrighted works.

224. Defendant maintains this library not as a byproduct of any single training run, but as a durable, reusable asset assembled through wholesale, unauthorized copying. Defendant's reproduction of the sound recordings it used to train its models in connection with its

maintenance of this library for its own business purposes is non-transformative and clearly not fair use.

225. Defendant clearly intends to draw on its library of stolen musical content in order to train and retrain successive generations of its models, as well as fine-tune, improve, and test its existing models, and develop new commercial products and features.

**VIOLATIONS OF THE DMCA**

226. Upon information and belief, defendant acquired many of the Copyrighted Tracks by illicitly accessing and downloading them from websites like YouTube and Spotify using a notorious method of music piracy known as "stream ripping".

227. YouTube, for example, is a popular platform for sharing audio/visual content with users. YouTube allows users to "stream" content—playing it as it is retrieved—but, as set forth below, it is not designed to allow and actually prohibits unfettered access to and the making of permanent, unrestricted copies of the content it streams. Plaintiff upload each of the Copyrighted Tracks to YouTube, and other creators have used plaintiff's Copyrighted Tracks is very popular videos (some with over 1 million views).

228. When doing so, plaintiff included information in the description for each Copyrighted Track, conspicuously identifying their copyrighted status, including the name of the record label that provided the Copyrighted Track, the copyright owner, and a clear demarcation that each Copyrighted Track was, indeed, subject to copyright protection.

229. Like many other music streaming services, YouTube's Terms of Service generally prohibit the unauthorized use of recordings available on its platform. In fact, there are seven (7) separate places in YouTube's: (i) "Terms", (ii) the FAQs, (iii) the Copyright Policy, and (iv) use of music on YouTube video (all of which are incorporated into the Terms), that expressly prohibit the

unauthorized scrapping, download, and use of the musical content uploaded by creators, including plaintiff.

230. While YouTube facilitates streaming music and offers a substantially restricted download feature for paying subscribers, it does not permit downloading and making permanent, unrestricted copies of the content on the platform. In fact, YouTube employs enhanced technological measures to protect against unauthorized access to and copying of licensed content, such as Plaintiffs' sound recordings. Specifically, YouTube employs a "rolling cipher" encryption measure to control access to such content, preventing external sites or services from directly downloading protected media files. YouTube maintains two different URLs for any given video: the page URL, visible to the user, is for the webpage where the video playback occurs, and the file URL, not visible to the user, is for the video file itself that is played within the page. The file URL is encrypted using a complex and periodically changing algorithm—the "rolling cipher"—that is designed to impede external access to the underlying YouTube audio, video, or audio/visual files, thereby preventing or inhibiting any downloading, copying, or distribution of such files. In simple terms, the rolling cipher effectively controls a user's access to copies of copyrighted works uploaded to the platform and prevents an ordinary user from creating a permanent, unrestricted download of a sound recording made available on YouTube only for streaming and restricted downloading.

231. Even though YouTube periodically revises the rolling cipher by design, there are illicit tools and services that circumvent the encryption, download audio-visual content available on YouTube, and create copies that can be downloaded and further distributed by users without restriction. The use of digital tools to circumvent YouTube's rolling-cipher measure and access or download unrestricted copies of copyrighted content made available on YouTube only for streaming and restricted downloading independently violates copyright law.

232. Nevertheless, defendant utilized such a tool—such as, YT-DLP—to circumvent YouTube's encryption and impermissibly access, reproduce, and scrape copyrighted recordings from YouTube. Indeed, this unlawful step of stream ripping is the key means by which defendant engaged in its first infringing act of reproducing plaintiff's Copyrighted Tracks.

233. The same analysis can be applied to other websites, like Spotify, which are the more likely targets of defendant's illicit stream ripping.

234. Defendant's unauthorized extraction, copying, and storage of plaintiff's Copyrighted Tracks from sources like YouTube and Spotify, for use in its training data was accomplished by defendant's unlawful circumvention of YouTube's rolling cipher and any other technological measures YouTube and other websites have implemented to prevent the downloading and copying of licensed content.

235. Defendant's actions constitute repeated violations of the Digital Millennium Copyright Act's anti-circumvention provisions, which state, among other things, that "[n]o person shall circumvent a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(1)(A).

## DEFENDANT'S TRADE SECRET VIOLATIONS

236. Over the last two decades, the members of plaintiff created, modified, and refined complex methodologies and processes for creating, and properly layering, cinematic and ambient instrumental music.

237. Plaintiff, the members of plaintiff, and its predecessors in interest, have painstakingly guarded their methods and processes from disclosure; refusing interviews, or any type of public disclosure.

238. Plaintiff’s non-public methods and processes cannot be derived simply from listening to the Copyrighted Tracks. As described in detail below, plaintiff’s secret methods and process are not generally known and cannot be readily ascertained through proper means.

239. Upon information and belief, defendant employs a multi-stage autoregressive transformer pipeline to generate music, in which audio is built sequentially, token by token.

240. This pipeline converts input intent into discrete audio tokens, each stage conditioning on and building upon the prior stage's output, until a complete audio reconstruction is produced.

241. This architecture is structurally analogous to plaintiff's proprietary sequential creative process, in which each layer of a composition was built upon and conditioned on prior layers through an iterative, evaluation-driven methodology, the specifics of which constitute the trade secret at issue.

242. Defendant ingested plaintiff’s Copyrighted Tracks through improper means.

243. Defendant’s FLUX platform is, at its core, a reverse engineering machine. Defendant’s FLUX platform here, did exactly what it was designed to do: namely, surreptitiously obtain reproductions of the Copyrighted Tracks, and then reverse engineer them to access the very methods and processes plaintiff has protected from disclosure. Defendant not only illegally reverse engineered plaintiff’s secret process and methodologies for creating its recordings and compositions, it used plaintiff’s illegally obtained trade-secrets to create the same or similar songs as those created by plaintiff.

244. Defendant did not, and could not, have obtained plaintiff’s Copyrighted Tracks through permissive means. Plaintiff would not have issued defendant a license for any of the Copyrighted Tracks in order to protect the very trade-secrets plaintiff illegally accessed.

245. At no time did defendant have the express or implied consent of plaintiff, and it is clear defendant was well-aware of its impermissive acts. Upon information and belief, defendant not only was aware it was acquiring plaintiff's intellectual property by impermissive means, but calculated that the liability for its impermissive acts as part of the cost of doing business. In other words, defendant's model was - do wrong, and if or when caught, force lengthy litigations to mitigate damages.

246. When directly accused of using unlawfully obtained sound recordings in another matter, defendant did not deny the allegations. Instead, defendant claimed that its training data and methods are "competitively sensitive" and constitutes "trade secrets".

247. Defendant has refused to disclose its methods of ingestion and training, claiming that information is protected by trade-secret law. Even when plaintiff, and plaintiff's counsel, demanded disclosure, defendant refused.

248. Defendant has attempted to weaponize trade-secret law to protect the very methods it has used to violate plaintiff's trade-secret rights.

**i. Plaintiff's Trade Secret**

249. Traditional bands record music, generally, in a studio. Those recordings are then manipulated in production, sounds added (or removed), and manipulated to create the final sound recording. At times, traditional bands will record different instruments by themselves, and then layer the instruments (and vocals) over each other.

250. That is not how plaintiff creates its Copyrighted Tracks. Plaintiff developed, through years of trial-and-error, frequent testing, and experimentation various trade-secret methods and processes for creating its sound recordings.

251. Plaintiff's proprietary methods and processes include the development of sequences of sound that cannot be duplicated or reverse-engineered. Plaintiff also employs its

confidential methods and processes for creating numerous complete independent layers of music, and weaving those layers together. The way each layer of sound is engineered to integrate with the other layers, is akin to well-fitting puzzle pieces. Any change, at any layer, has a cascade effect that requires changes in the other layers. That is why it can take months for plaintiff to create a single Copyrighted Track.

252. Plaintiff has gone to great lengths to protect its trade secret methods and processes from disclosure. Plaintiff has refused all attempts to discuss its confidential methods and processes from other artists, news sources, and websites. The proprietary unduplicatable sound sequences, and the software developed to create them, as well as the confidential layering methods and processes, are kept on a single hard drive that is not exposed to the Internet to protect them from possible external disclosure.

253. In fact, plaintiff would not have granted defendant a license, had it sought one, because that would entail exposure to the very impermissible reverse-engineering of plaintiff's confidential processes and methods; which is exactly what happened.

254. Plaintiff's confidential trade secrets are incredibly valuable. As discussed above, plaintiff has employed its trade secret methods, processes, and sound sequences to create incredibly valuable sound recordings and compositions which have been licensed and used by hundreds of companies.

255. While the end product of plaintiff's processes and methods is publicly available, the actual complex methods and processes used in creating each layer of music, overlaying the layers in a specific manner, certain proprietary sound sequences, and how each layer is engineered to fit as an integral part with the other layers is not public and/or duplicatable. In fact, only a powerful AI system, like defendant's, is capable of reverse engineering, and employing

the very confidential and proprietary methods and processes plaintiff has decades developing, reefing, and protecting from disclosure.

256. While the members of plaintiff play each instrument used in every layer, the band "The American Dollar" rarely plays live performances because it is not possible to fully duplicate the nuanced layers of music in each of the Copyrighted Tracks in a live performance.

257. Plaintiff is not claiming that a portion of each Copyrighted Track cannot be recreated by sound engineers and other musicians. Instead, it is the inclusion of certain sound proprietary sequences employed in many of the Copyrighted Tracks, and the methods and processes for creating those sequences, as well as the methods and processes for creating and layering music, and the integration of those layers into a coherent and identifiable sound that cannot be reversed engineered.

258. By ingesting plaintiff's Copyrighted Tracks into its defendant's powerful FLUX platform, defendant has ingested and co-opted plaintiff's proprietary, and confidential, methods, processes, and certain sound sequences used to create plaintiff's identifiable sound.

259. It now takes seconds for defendant's powerful FLUX platform to deploy the very trade secret sound sequences, methods, and process plaintiff has spent decades developing and refining.

260. Defendant not only acquired plaintiff's Copyrighted Tracks by an impermissive means, and has impermissibly reverse engineer and co-opted the very proprietary methods, processes, and sound sequences plaintiff has protected from disclosure.

261. Defendant's entire business model is predicated on ingesting, analyzing, and incorporating the fundamental mechanics utilized in the creation of the sound records it is trained on. Defendant has, in fact, impermissibly ingested and reverse engineered the very confidential

proprietary methods and processes plaintiff has spent decades developing and protecting from disclosure.

262. A trade secret may consist of any formula, process, device or compilation of information which is used in one's business and which provides an opportunity to obtain an advantage over competitors who do not know or use it.

263. Upon information and belief, defendant employs a unified multimodal flow-matching diffusion architecture, known as "Self-Flow," in which audio and video are generated jointly from a single backbone rather than through separate or composited processes.

264. This architecture conditions generation on the input prompt and iteratively refines the joint audio-visual output through successive flow-matching steps, such that the audio component's specific musical character is a direct product of the same staged, dependent training and generation process as the visual component.

265. This architecture is structurally analogous to plaintiff's proprietary sequential creative process, in which each layer of a composition was built upon and conditioned on prior layers through an iterative, evaluation-driven methodology, the specifics of which constitute the trade secret at issue.

266. Defendant confirmed via its official website and multiple independent reporting on the July 2026 launch that the FLUX.3 model uses joint multimodal training and a unified flow-matching diffusion backbone, though granular technical detail (specific to how audio is derived within that framework).

267. Defendant’s FLUX.3 platform confirmed joint audio-visual training on a unified flow-matching backbone reflects the same essential operative logic as plaintiff's proprietary methodology — iterative, staged construction of interdependent creative elements toward a

coherent emotional target. Because FLUX.3 generates synchronized audio and video from a single unified backbone rather than compositing them separately, the specific character of the generated music is a direct product of how the joint model was trained — which included training on plaintiff's Copyrighted Recordings without license or authority.

268. Defendant has violated plaintiff's rights under the Uniform Trade Secret Act.

**DEFENDANT CANNOT CLAIM FAIR USE**

269. A claim of fair use does not comport to the standards of "fair use" set forth in Section 107 of the Copyright Act.

270. The "fair use" doctrine has been coined an "equitable rule of reason" that balances various contextual factors to determine whether an unauthorized use of a copyrighted work is "fair." Defendant, however, cannot launder its conscious stealing of the Copyrighted Tracks for commercial gain with an appeal to equitable principles. Defendant understands that what it is doing is legally wrong and inequitable, which explains why it refused to even acknowledge the extent of its unauthorized use of plaintiff's Copyrighted Tracks, and why it tries to cover its tracks when users publicize outputs that clearly reflect training on the Copyrighted Tracks. Defendant's conduct violates the very purposes of the copyright law and runs contrary to the purpose animating the fair use doctrine.

271. The Copyright Act at Section 107 identifies examples of the types of uses that may qualify as fair, including "criticism, comment, news reporting, teaching . . . scholarship, or research." These paradigmatic fair uses reflect the policy of ensuring public availability of "literature, music, and other arts" so that other humans can draw on those works to create new ones. Defendant's wholesale copying of countless Tracks serves none of these purposes.

272. Defendant's FLUX platform and outputs do not offer "commentary" or "scholarship" or promote human authorship. Rather, defendant's FLUX platform copies and ingests copyrighted works to create computer generated imitations of human expression that do not merit copyright protection. Defendant's motive is brazenly commercial and threatens to displace the genuine human artistry that is at the heart of copyright protection.

273. Moreover, applying the statutory fair use factors set forth in Section 107 demonstrates that defendant's conduct fails to qualify as fair use. These factors are: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

274. The use of an original work to achieve a purpose that is the same as, or highly similar to, that of the original work is more likely to substitute for the work, and thus is less likely to constitute "fair use".

275. Defendant un lawfully reproduced plaintiff's Copyrighted Tracks, and generates digital music files that are designed to entertain, evoke emotion, and stoke passion, just like the genuine sound Copyrighted Tracks on which FLUX was trained. Defendant feeds plaintiff's Copyrighted Tracks into its AI model not merely to deconstruct their expressive content, and the methods and processes used to create each work, but with the explicit aim of imitating these expressive, and architectural features in its digital music files that could serve as substitutes for and compete with the original Copyrighted Tracks.

276. The use of the Copyrighted Tracks by defendant here is far from transformative, as there is no fair-use purpose that would justify defendant's FLUX platform ingesting plaintiff's

Copyrighted Tracks, reverse engineering them, only to spit out highly similar competing music files.

277. Defendant is copying the Copyrighted Tracks for a commercial purpose, and is deriving revenue directly proportional to the number of music files it generates.

278. Defendant extensively reproduced the most important musical elements of each Copyrighted Track. It reverse-engineered each Copyrighted Track so it could mimic the very feel and artistic expression encompassed by each Copyrighted Track.

279. Defendant not only unlawfully copied all of the key elements of protectable expression, it then used those elements to generate music files that resemble the Copyrighted Tracks it ingested.

280. Defendant's use of Copyrighted Tracks poses a significant threat to the market for and value of the Copyrighted Tracks. Licensing is at the core of plaintiff's businesses. Defendant's unauthorized use of the Copyrighted Tracks has devasted the licensing market for the Copyrighted Tracks, and threatens to eliminate it all together if it is allowed to proceed, unfettered, and in direct violation of the law.

281. After all, why would potential licensees be interested in licensing the Copyrighted Tracks, when it could simply generate an AI-soundalike at virtually no cost. This is an especially aberrant result when the replacement videos and associated audio-files are generated by defendant's FLUX platform using the very Copyrighted Tracks defendant unlawfully reproduced and reverse engineered.

282. Moreover, defendant's FLUX platform has the potential to generate directly competing digital music files at such speed that it risks overrunning the market for human-made

sound recordings, including the Copyrighted Tracks on which it was trained. This competition is ramping up at a breathtaking pace.

283. Independent artists, like plaintiff, will no longer be able to survive if defendant is allowed to steal plaintiff's life's work, and then undermine the market with AI-generated sound-alikes.

284. The harm defendant is causing goes far beyond these immediate economic consequences. Defendant's wholesale theft of the Copyrighted Tracks threatens the entire music ecosystem and the numerous people it employs. It also degrades the rights of artists to control their works, determine whether future uses of their works align with their aesthetic and personal values, and decide the products or services with which they wish to be associated. It also propagates the destructive theory that copyrighted music is free for the taking whenever a new technology claims that seeking and obtaining permission is just too cumbersome. In other words, defendant's conduct is a frontal attack on the very purpose of copyright law to reward authors and promote their incentives to continue creating copyrighted works.

285. Plaintiff is the most vulnerable group that has been prayed on by defendant. Unlike other matters filed against defendant, plaintiff is comprised of two independent musicians who have made a living from the revenue generated from their Copyrighted Tracks. A living that has now been completely undermined by defendant. Worst of all, defendant utilized plaintiff's decades of work to destroy the very market plaintiff has developed. Plaintiff is composed of two, of thousands, independent musicians who have been crushed by defendant's blatant acts of copyright infringement.

## FIRST CLAIM FOR RELIEF
## COPYRIGHT INFRINGEMENT

286. Plaintiff incorporates the allegations contained in the preceding paragraphs as if set forth here at length here.

287. It cannot be disputed that plaintiff has valid, registered copyrights, and owns all rights to the Copyrighted Tracks.

288. Defendant has knowingly infringed plaintiff's exclusive rights to the Copyrighted Tracks by reproducing them in violation of 17 U.S.C. § 106(1).

289. At no time did defendant have authorization, permission, license, or consent to reproduce or otherwise use the Copyrighted Tracks.

290. Upon information and belief, defendant used the reproductions of the Copyrighted Tracks to train its generative AI model.

291. Each of defendant's acts of infringement of the Copyrighted Tracks is a willful violation of 17 U.S.C. § 106.

292. As a direct and proximate result of defendant's infringement of plaintiff's exclusive rights, defendant has caused and will continue to cause irreparable injury to plaintiff for which plaintiff has no adequate remedy at law. Plaintiff is therefore entitled to injunctive relief and to either actual damages and defendant's profits or statutory damages pursuant to 17 U.S.C. § 504(c), together with plaintiff's costs and reasonable attorneys' fees pursuant to 17 U.S.C. § 505.

**SECOND CAUSE OF ACTION**
**Violation of the Uniform Trade Secret Act**
**N.Y. CLS Labor Law § 201-e**

293. Plaintiff incorporates the allegations contained in the preceding paragraphs as if set forth here at length here.

294. Plaintiff has spent decades defining and developing methods and processes to create its music which have been utilized on a continuous basis in the operation of the business.

295. Plaintiff's confidential and proprietary methods and processes are not known to anyone outside of plaintiff.

296. No employee, collaborator, musician, or external party has ever been made privy to plaintiff's confidential and proprietary methods and processes.

297. Plaintiff has guarded the secrecy of confidential and proprietary methods and processes.

298. Plaintiff's confidential and proprietary methods and processes, employed in the creation of its music and unique sound sequences, are incredibly valuable. They are fundamental to the creation of plaintiff's Copyrighted Tracks, which have generated significant revenue.

299. The unique sound sequences, which cannot be reversed engineered, have been stolen, and used by others on hundreds, probably thousands of occasions.

300. One unique sound sequence in the Copyrighted Track "Anything You Synthesize" has been used by at least ten (10) other musicians in the songs because the sound sequence cannot be reverse engineered, but must be copied directly from the Copyrighted Track.

301. Plaintiff's confidential and proprietary methods and processes, if known by others, could be used to re-create the core aspects of plaintiff's business.

302. Plaintiff has expended decades, at significant expense, creating, modifying, and refining its confidential proprietary methods and processes.

303. Defendant acquired plaintiff's Copyrighted Tracks through improper means.

304. It would be nearly impossible to impossible to replicate the plaintiff's confidential and proprietary methods and processes through normal means.

305. In fact, only a powerful AI system, like defendant's, is capable of reverse-engineering plaintiff's confidential and proprietary methods and processes. Defendant, like other AI companies, would not have been able to obtain the rights to the Copyrighted Tracks by permissible means.

306. Defendant, through its powerful FLUX platform, was able to analyze the Copyrighted Tracks and create new music files based on plaintiff's confidential and proprietary methods and processes, and the sound sequences they produce.

307. Defendant is, and was, able to impermissibly co-opt the decades of time, and significant costs, expended by plaintiff in the creation of its confidential methods and processes.

308. Defendant has violated plaintiff's rights pursuant to the Uniform Trade Secret Act, and plaintiff is entitled its actual loss, defendant's unjust enrichment, and/or reasonable royalty. Plaintiff is also entitled to the reasonable costs and attorney's fees incurred in this action.

**THIRD CAUSE OF ACTION**
**TRADE SECRET VIOLATION**
**Protect Trade Secret Act 18 U.S.C. § 1836**

309. Plaintiff incorporates the allegations contained in the preceding paragraphs as if set forth here at length here.

310. Plaintiff's confidential and proprietary methods and processes are employed to create songs that have been streamed and licensed nationally interstate and internationally.

311. Defendant acquired plaintiff's confidential and proprietary methods and process by reverse-engineering the Copyrighted Tracks which were acquired by impermissive means.

312. Defendant's acts violate plaintiff's rights pursuant to the Protect Trade Secrets Act.

313. Plaintiff is entitled its actual loss, defendant's unjust enrichment, and/or reasonable royalty. Plaintiff is also entitled to the reasonable costs and attorney's fees incurred in this action.

**FOURTH CAUSE OF ACTION**
**VIOLATIONS OF THE DMCA**
**17 U.S.C. §§ 1201 et seq.**

314. Plaintiff incorporates the allegations contained in the preceding paragraphs as if set forth here at length here.

315. Plaintiff owns and exercises exclusive control over the rights to the Copyrighted Tracks, which plaintiff uploaded to YouTube Spotify, and other Internet websites that allow the streaming of musical content.

316. Defendant "stream ripped" the Copyrighted Tracks from YouTube and/or Spotify, as well as possibly other sources.

317. Defendant circumvented the technological measures implemented by YouTube, Spotify, and others, to prevent access to the Copyrighted Tracks.

318. Defendant has repeatedly violated 17 U.S.C. § 1201(a).

319. Specifically, defendant employed code to access, extract, copy, and download audio files of the Copyrighted Tracks from YouTube, Spotify, and possibly other sources without the authorization of plaintiff or YouTube, and in violation of the YouTube and Spotify Terms.

320. Plaintiff has been harmed by defendant's violations of 17 U.S.C. § 1201(a).

321. Defendant's circumvention of the technological measures has facilitated defendant's ongoing and systematic infringement of plaintiff's Copyrighted Tracks through its unauthorized use of the Copyrighted Tracks in its training data.

322. As a direct and proximate result of defendant's violations of 17 U.S.C. § 1201(a), plaintiff is entitled to either the maximum statutory damages pursuant to 17 U.S.C. § 1203(c)(3)(A) or, in the alternative, its actual damages pursuant to 17 U.S.C. § 1203(c)(2), including defendant's profits from circumvention in amounts to be proven at trial, together with plaintiff's costs and reasonable attorneys' fees pursuant to 17 U.S.C. §§ 505 and 1203(b)(4),

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for judgment against defendant, and awarding plaintiff as follows:

1. For a declaration that defendant has willfully infringed plaintiff's Copyrighted Tracks.
2. For statutory damages pursuant to 17 U.S.C. § 504(c), in an amount up to the maximum provided by law, arising from defendant's willful violations of plaintiff's rights, including in an amount up to $150,000 per work infringed; or, in the alternative, at plaintiff's election, plaintiff's actual damages and/or defendant's profits from infringement pursuant to 17 U.S.C. § 504(b), in an amount to be proven at trial;
3. Plaintiff's reasonable attorneys' fees and costs (17 U.S.C. § 505);
4. Plaintiff's actual loss, defendant's unjust enrichment, and/or a reasonable royalty for defendant's violation of the Uniform Trade Secret Act;
5. Plaintiff's reasonable costs and attorney's fees incurred in this action under the Uniform Trade Secret Act;
6. Plaintiff's actual loss, defendant's unjust enrichment, and/or a reasonable royalty for defendant's violation of the Protect Trade Secrets Act;
7. Plaintiff's reasonable costs and attorney's fees incurred in this action under the Protect Trade Secrets Act.
8. An award of statutory damages for each violation by defendant of the DMCA, 17 U.S.C. § 1201.
9. Reasonable attorneys' fees and costs (17 U.S.C. § 505);

10. Pre- and post-judgment interest to the extent allowable; and,

11. Such other and further relief that the Court may deem just and proper.

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: October 20, 2026
New York, New York

GARBARINI FITZGERALD P.C.

By: ______________________
Richard M. Garbarini (RG 5496)